# EXHIBIT B

A.    Yes.

Q.    And can you describe for me the type of business that Bruce Oakley, Inc., operates?

A.    Barge, transportation logistics, and handling, business.

Q.    Does Bruce Oakley, Inc.'s, business involve storing goods for third parties?

A.    Yes.

Q.    Do you know approximately how many employees Bruce Oakley, Inc., has?

A.    No.

Q.    Would you say it's greater than 50 employees?

A.    Yes.

Q.    Would you say it's greater than a hundred employees?

A.    Yes.

Q.    Now to clarify, when you say there's more than a hundred employees of Bruce Oakley, Inc., are you including employees of any Bruce Oakley, Inc., subsidiary companies in estimating that number?

A.    Yes.

Q.    Do you know how many employees are



A.   Yes.

Q.   Which company is that?

A.   Johnston's or Oakley's Port 33 doing business as Johnston's Port 33.

Q.   If I asked you to describe the business of Oakley Port 33, would it be different than your description previously for Bruce Oakley, Inc.?

A.   No.

Q.   Same question for JP 33.  Would the description of JP 33's business be different than how you described Bruce Oakley, Inc.'s, business?

A.   No.

Q.   How long have you been employed by Oakley Port 33?

A.   Since I was 18.  I'm 45 now.

Q.   Have you ever been employed by JP 33 or Johnston's Port 33, Inc.?

A.   Yes.

Q.   Are you currently employed by Johnston's Port 33, Inc.?

A.   Yes.

Q.   Mr. Taylor, do you know if you receive

a pay stub for your salary which entity is listed on that pay stub?

A.    Oakley's.

Q.    When you say Oakley's, is that are you referring to a different company or is that referring to Bruce Oakley, Inc.?

A.    Bruce Oakley, Inc.

Q.    Have you ever been employed by Bruce Oakley, Inc.?

A.    Yes.

Q.    Are you currently employed by Bruce Oakley, Inc.?

A.    Yes.

Q.    What's your title with regard to your employment with Bruce Oakley, Inc.?

A.    General manager of Oklahoma.

Q.    And are you also the general manager for Oklahoma for JP 33?

A.    Yes.

Q.    And prior to nine months ago when you were in your role as terminal manager for Oakley Port 33, were you also employed as the terminal manager for JP 33 and as the terminal manager for Bruce Oakley, Inc.?

A.    Yes.

Q.    Do you know when JP 33 was acquired by Bruce Oakley, Inc.?

A.    February of -- six or seven years ago I believe.

Q.    If it was February of 2014, does that sound correct?

A.    Yes.

Q.    Is it fair to say that since Bruce Oakley, Inc., acquired JP 33, that you've held employment with each of Oakley Port 33, JP 33, and Bruce Oakley, Inc.?

A.    Yes.

MR. HEFFLEY:  Let me object to the form of the question.  And, Adam, let me just say I mean there may be some confusion in my mind and also in Josh's mind which entity is actually his employer.  I think he's trying to answer your questions as best he can.  But that's why I object to the form of the question.  We may clear this up later.

MR. MCCABE:  Yeah.  I understand.  I'm just trying to understand it myself.  So I do appreciate that there might be some lack of



you to arrange for storage or is it possible that they may have contacted the general manager who was in place at that time?

A.   They would contact me, terminal manager.

Q.   Would customers ever contact anyone else other than you if they wanted to arrange for storage?

A.   Yes.  They would contact Steve Taylor or Fred Taylor, and 99 percent of the time they would redirect them to myself.

Q.   So it's fair to say that at least back in 2018 and 2019 when you were the terminal manager, you were involved in nearly all of the agreements to store goods at the Muskogee Terminal on behalf of Oakley's customers, correct?

A.   Correct.

Q.   At that time in 2018 and 2019 were you also responsible for arranging the storage of customers' goods at the Muskogee Terminal on behalf of JP 33?

A.   Yes.

Q.   In 2018 and 2019 how was it determined



December of 2012?

A.    Yes.

Q.    And can you explain what this rate form depicts?

A.    Rates for handling and storage of steel rebar.  It gives the handling rates, the monthly storage rate, transfer fee, and then the miscellaneous breakdown description of what we require.

Q.    And I believe you testified earlier that this form was part of the process when a customer like Tata would contact you as terminal manager and you would negotiate this storage of the customer's goods at the Muskogee Terminal, correct?

A.    Correct.

Q.    Do you recall were there any other documents issued by Johnston Port 33, Inc., in December 2012 other than this form to its customers describing the agreement to store the customer's goods at the Muskogee Port?

A.    No.

Q.    And so with regard to this specific document issued in December of 2012 to Tata



2019, for Tata's goods at the terminal, is there a way to look that up?

A.   Yes.

Q.   Okay.  I want to kind of switch gears a little bit here and ask you some different questions.  In 2019 are you aware whether or not the Muskogee Terminal had a formal flood plan in place?

A.   We did not have a flood plan in place.

Q.   To your knowledge had anyone at the Muskogee Terminal ever discussed what would be done in case of a potential flood in 2019?

A.   We had verbal conversations, yes.

Q.   Were you part of those conversations?

A.   Yes.

Q.   Were these conversations that you're referring to prior to 2019?

A.   Yes.

Q.   Was there a single conversation that you recall or were there several conversations that were had orally?

A.   Throughout my 30 years we've had several conversations.

Q.   So understanding that you've had

me.

Q.   I'm sorry.  Did you identify that person just now?

A.   Yes.

Q.   Can you repeat that?

A.   D-e-s-a-d-e-l -- s-a-u-t-e-l.

Q.   And does that individual still work at the terminal?

A.   Yes.  He's the terminal manager now.

Q.   Is there a flood plan in place at the Muskogee Terminal today?

A.   No.

Q.   If there were similar circumstances today as there were in May of 2019 regarding a potential flood, would the terminal undertake the same protective measures today as it did in 2019?

MR. HEFFLEY:  Object to the form.

THE WITNESS:  Yes.

BY MR. MCCABE:

Q.   Is there anything additional that the terminal would do today that it didn't do in 2019?

MR. HEFFLEY:  Object to the form.



THE WITNESS:  I wouldn't be there if there was another flood but no.

BY MR. MCCABE:

Q.   I appreciate that.

A.   I would leave.

Q.   In preparing for the flood in 2019, did those preparations include taking measures to protect the terminal's equipment?

A.   The terminal's what?

Q.   Their equipment so, for example, the truck or the pickup trucks, any of the machinery at the terminal.  Were any measures undertaken to protect that equipment?

A.   Yes.  During a flood as water was actually coming over the dock, yes, that's when we started removing the rolling stock to higher ground.

Q.   Sorry.  Can you explain again what the broken stock is?

A.   Rolling, rolling, anything on wheels.

Q.   Got you.  So that stock, is that all of -- is all of that stock owned by Oakley?

A.   Yes.

Q.   And other than the rolling stock, were



when I come back, I won't have too much more.
I'm almost done.

MR. HEFFLEY:  Let's take just five.

MR. MCCABE:  All right.  That works.

(Whereupon, a short break was

taken.)

BY MR. MCCABE:

Q.   All right, Mr. Taylor, I just have a
few more areas to discuss.  Hopefully it won't
take too much longer.

Prior to the 2019 flood event, did
Bruce Oakley have any experience at any of its
facilities along the Arkansas River with regard
to flooding?

A.   Not that I know of.

Q.   So would that include any experience
Bruce Oakley might have at the Muskogee Terminal
with regard to flooding?

A.   Yes.

Q.   Did you have any experience personally
with flooding at any locations on the Arkansas
River prior to 2019?

A.   '86 flood.

Q.   What was your experience with the 1986

flood?

A.    I had to help sandbag, fill sandbags.

Q.    And did you help sandbag at any specific location along the river?

A.    At Muskogee.

Q.    At Muskogee.  At the terminal?

A.    Yes.

Q.    Do you remember how old you were at that time?

A.    10.

Q.    10, okay.  Do you personally remember anything specific about that flood event in 1986 to the best of your recollection?

A.    I remember water coming up as fast as it did because the rain it only rained at one draw of the river.  It came up.  It came to the bottom of the dock.  And then the next day when I showed back up, it had dropped down already.

Q.    Okay.  I believe at the prior deposition earlier today Mr. Cummins approximated there were about six Bruce Oakley facilities along the Arkansas River.  Is that what you believe there to be?

A.    Yes.

Q.    Do you recall at what point in the days or weeks leading up to May 22 Oakley determined that there was a potential for flooding of their Muskogee Terminal?

A.    Yes.

Q.    When was that?

A.    Probably close to that Monday, which would have been the 21st or the 20th.  That's when we knew there is a real chance.  But the Corps was still telling us they were going to take the elevation to the top of my dock, which was 512 because they knew if they took it above that, we would be flooded out.

Q.    So a couple things to clarify.  So you said it was close to that Monday.  When you say close to it, do you mean within a few days, within a week?  Can you clarify what you mean when you say --

A.    It was that Monday that we had -- our chances were 50/50 on that Monday if it was going to flood or not.  Now when we say flood, we didn't know a foot, 6 inches.  We didn't know.  I mean nobody knew.

Q.    And when you just testified that the



Army Corps was telling you the level was, the river level was at 512 and that's because they knew anything above that would flood, are you suggesting that the actual river levels being predicted at that time were known to be higher than 512?

A.    At that time they were calling me asking.  I would talk to them also, and they would say how far is it from the bottom of your dock?  I would take a tape measure and say it's 3 foot from the top of my dock.  And she would say, well, that's higher than what we thought it was.  Let's recalculate things.

Q.    Can you describe the damage to the property at the Muskogee Terminal as a result of the May 2019 flooding event, and let's start with can you describe the damage to the warehouse structures themselves?

A.    Warehouse structures were not damaged. It was 5, 6 foot of water in the warehouse. None of the footings that we feel have been damaged.  We have not had any engineers come in and dig up our footings to inspect them, but none are moving.  Our road beds have all



A.   Correct.

Q.   You'd agree that the top part of the sheet talks about rates and the miscellaneous part there explains what Oakley's will or will not be responsible for.  But those last four lines also describe things that you interpret as contract terms; is that right?

A.   Correct.

MR. HEFFLEY:  No further questions.

MR. MCCABE:  Yeah.  I just have a few questions to follow-up on that.

EXAMINATION

BY MR. MCCABE:

Q.   If you look at the prior rate sheet, there's similar language but it's not exactly the same.  Would you agree?

A.   Yes.

Q.   Do you know why the language was changed between the January 2019 rate sheet and the August 1, 2020, rate sheet?

A.   No, I do not.  I sent these to Tim for approval and he changed the verbiage but I do not know why he changed the verbiage.

Q.   Okay.  And then you'll also agree that